8IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,869

STATE OF KANSAS,
*Appellee*,

v.

STEPHEN ALAN MACOMBER,
*Appellant.*

SYLLABUS BY THE COURT

1.

On a motion for immunity under K.S.A. 2018 Supp. 21-5231, the district court must consider the totality of circumstances, weigh the evidence before it without deference to the State, and determine whether the State carried its burden to establish probable cause that the defendant's use of force was not statutorily justified.

2.

An appellate court will apply a bifurcated standard of review to a district court's determination of probable cause under K.S.A. 2018 Supp. 21-5231. When a district court's ruling entails factual findings arising out of disputed evidence, a reviewing court will not reweigh the evidence and will review those factual findings for supporting substantial competent evidence only. The ultimate legal conclusion drawn from those facts is reviewed de novo.

3.

When a defendant properly asserts a self-defense affirmative defense, the State must disprove that defense beyond a reasonable doubt.

Review of the judgment of the Court of Appeals in an unpublished opinion filed June 23, 2017. Appeal from Shawnee District Court; DAVID DEBENHAM, judge. Opinion filed May 17, 2019. Judgment of the Court of Appeals affirming the district court is affirmed on the issues subject to review. Judgment of the district court is affirmed.

*Jonathan B. Phelps*, of Phelps-Chartered, of Topeka, argued the cause and was on the briefs for appellant; *Stephen A. Macomber*, appellant was on a supplemental brief pro se.

*Jodi E. Litfin*, assistant solicitor general, argued the cause, and *Elizabeth A. Billinger*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Stephen A. Macomber shot and killed an unarmed man during a confrontation in the man's driveway. The district court denied Macomber's pretrial motion to dismiss based on self-defense immunity. After a second trial, a jury convicted him of involuntary manslaughter. A Court of Appeals panel affirmed that conviction. Macomber seeks our review of two defense arguments the panel rejected: (1) whether the district court should have granted him self-defense immunity; and (2) whether the district court's failure to instruct on the statutory self-defense presumption requires reversal.

We unanimously reject Macomber's claim the district court erred when it denied him self-defense immunity under K.S.A. 2018 Supp. 21-5231. The State demonstrated with sufficient evidence there was probable cause Macomber's use of deadly force was not statutorily justified, so this presented a jury question. On the second issue, a majority of the court agrees with the panel that any error in not giving the self-defense presumption instruction was harmless. The judgment of the panel is affirmed on the issues subject to our review.

2

FACTUAL AND PROCEDURAL BACKGROUND

Macomber killed Ryan Lofton outside Lofton's southeast Topeka residence. Macomber fled to Marshall County, where he shot a sheriff's deputy, fled in the deputy's patrol vehicle, and took a hostage whom he held until eventually surrendering. Macomber was prosecuted in this case for his actions in Shawnee County. His additional crimes were prosecuted in two Marshall County cases. See *State v. Macomber*, No. 113,869, 2014 WL 4723685, at *1 (Kan. App. 2014) (unpublished opinion) (*Macomber I*).

In this Shawnee County case, with which this appeal is concerned, the State charged Macomber with first-degree murder and criminal possession of a firearm. There were two jury trials. In the first, the jury convicted him of intentional second-degree murder and criminal possession of a firearm. 2014 WL 4723685, at *7. A Court of Appeals panel reversed and remanded for a new trial. See 2014 WL 4723685, at *10, 12.

Before the second trial, Macomber attempted to dismiss the case, asserting self-defense immunity under K.S.A. 2018 Supp. 21-5231. The district court held the State presented sufficient evidence to establish probable cause that deadly force was not statutorily justified.

The evidence about what happened during the encounter between Macomber and Lofton came from four eyewitnesses during the retrial:  Lofton's wife, Risa; Macomber; Cassandra Taylor; and Joshua Kenoly. Their accounts conflicted. We detail that testimony and the other evidence to decide the two issues on review.

3

*Risa Lofton's statements*

Risa testified she asked Macomber to pick her up at her home. Macomber was leaving town and Risa wanted to get money from him. She told Lofton he was taking her to a "dope house" and she planned to steal money from Macomber. Lofton was unhappy about this and did not think she would return. According to Risa, Macomber pulled into the driveway and stayed in his car. When he arrived, she was inside with Lofton. She gathered her things and put them in the driver's side back seat of Macomber's car. Lofton stood at the passenger side window talking to Macomber. Risa said Lofton was not yelling and she did not hear any threats. Macomber had a gun inside the car and trained it on Lofton while Lofton was walking back toward the car.

Lofton went around to the driver's side window, which was rolled down a couple of inches. Risa tried to pull Macomber's arm away, but she could not get the gun from Macomber or get him to point it away from Lofton. She got out and shut the door. As soon as it shut, she heard a "pop," turned around, and saw Lofton on the ground. Macomber left immediately.

Risa did not see Lofton reach into Macomber's car or hear him threaten Macomber. On cross-examination, she said Lofton was upset when Macomber arrived but not angry. She did not see what Lofton did while standing at the driver's side window.

*Macomber's statements*

Macomber made several statements about the incident. Hedy Saville testified he went to her house after the shooting and said he killed a man in Topeka. She said Macomber said the man was going to shoot Macomber. In a telephone call with KBI agent Mark Malick before his arrest, Macomber said he was encountered by a man "'acting like a fool.'" He told Malik the man threatened to shoot him but did not have a

4

gun. The man tried to grab Macomber's gun, and when he did Macomber shot him. He told Malik he did not intend for that to happen. He told Malik the man said "you want to shoot me" and indicated "like you're talking big and you don't even have a gun and that was when he said it occurred." The agent said Macomber told him "it was then that he decided to fire off a round," and that the man "kept talking shit like I was afraid of him so I shot him." On cross-examination, Malick said Macomber indicated "on a couple occasions" that the guy was grabbing his gun. Malick also said Macomber was distressed during their conversation and made suicide threats.

In a later interview with KBI agent Steve Bundy, Macomber explained he went to pick up Risa and that Lofton came to the car and started "some shit" with him, so he threatened to shoot Lofton. He did not know if Lofton had a gun but assumed he did. He told Lofton "well I've got a fucking gun, right here." Lofton walked away but returned and started "fucking with" him. Lofton tried to snatch the gun. Macomber said the gun was in a Crown Royal bag. He did not know which way the gun was pointed. He said he planned to fire a round off to get Lofton off the car. He said his windows were down and Lofton wanted to grab the glass and break his window. He said he just wanted to go, but Lofton would not let him. He "let a round . . . go off" and guessed it hit Lofton. He said Lofton threatened to shoot him and had a house full of people. He claimed there were five recent neighborhood shootings.

In a recorded jailhouse telephone call with his father, Macomber said he fired off one round into the air and hit a guy. And in a call with someone named Theresa, he said he had a gun because he knew what kind of area he was in. He said he went over to the house to get Risa and as soon as he pulled up Lofton came to the car and began questioning him and accusing him of sleeping with Risa. He said Lofton threatened to shoot him and there were four or five people inside and outside the house on the porch. Lofton started going toward Macomber's side of the car. He said he told Lofton he had a

5

gun, so if Lofton started shooting he would be shooting too. He said Lofton began pulling on his door and trying to grab his gun. He said he fired off a round to let Lofton know it was a gun.

*Cassandra Taylor's statements*

Taylor was in her car, which was parked in the driveway ahead of Macomber's car. Joshua Kenoly was also in the car. A short time after Taylor parked, Risa came out the front door with bags in her hand. Macomber pulled in behind Taylor. Watching in her rearview mirror, Taylor saw Risa pass her car on the driver's side and put bags in Macomber's car. Lofton followed Risa around arguing with her. She thought the argument was over Lofton not wanting Risa to leave. Risa got in Macomber's car on the passenger side. She saw Lofton go to Macomber's car's passenger side. She saw a flash and Lofton threw his arms up and said he was shot.

Taylor said she saw struggling inside the car before the flash. She also said Lofton had his head in the car, and there was struggling between Lofton and either Risa or Macomber. She said Lofton was on the car's passenger side and facing away at the time of the flash. On cross-examination, she said she was positive she saw Lofton on the passenger side. She described the argument between Lofton and Risa as angry yelling. She saw a struggle between Lofton and Risa about getting out of the car. Lofton stuck his head inside the car at some point. On redirect, she said Lofton never got into the car.

*Joshua Kenoly's statements*

The defense put on testimony from Kenoly, who said he did not recall the incident or his earlier testimony, so his preliminary hearing testimony was read. In that transcript, Kenoly testified Macomber pulled up to the house and Risa got into the car. Lofton came out and tried to keep her from leaving. Lofton was outside the passenger door telling her

6

he did not want her to leave. Lofton started talking to Macomber, then they got into "a little tussle." Next, Kenoly said, he heard Lofton ask, "What are you going to do, shoot me?" Lofton was still standing by the driver's side window. Kenoly thought Lofton was less than a foot away from Macomber and did not think Lofton was touching the car. Kenoly heard a gunshot and ducked. When he got up, Lofton was on the ground. On cross-examination, Kenoly said he believed the car's windows were down. He said the tussle lasted maybe five seconds. He defined a "tussle" as "a little bodily movement with each other."

Detective Roger Smith, who interviewed Kenoly the day of the shooting, said Kenoly told him Lofton had a heated conversation with Risa, then went to the driver's side to talk to Macomber. He said the conversation was heated, then got even more heated and more aggressive. Lofton reached inside the car at Macomber. They tussled for a few moments. Kenoly heard Lofton say, "[S]o now you're gonna shoot me, huh, mother fucker?" He heard one gunshot. Lofton staggered back and fell.

A defense investigator who interviewed Kenoly the week before the retrial said Kenoly told him he was at the house with Lofton and that Risa arrived with Macomber. Afterward, Lofton came out and was upset Risa showed up with Macomber, who remained in the car. There was a heated argument, and Lofton's demeanor was aggressive. Kenoly saw a tussle between Macomber and Lofton. He saw Lofton reach inside the vehicle and saw pushing and pulling motions. Lofton was standing outside on the driver's side. Kenoly said he was on the porch facing away from the vehicle when he heard a shot. He said Lofton was the aggressor.

7

*The autopsy*

An autopsy confirmed Lofton died from a gunshot that entered his back on the left side beneath the shoulder blade. The deputy coroner who performed the autopsy said there was no indication the gun was fired at close range, meaning within 24-35 inches. There was no stippling soot or unburned powder on Lofton's clothing, and no stippling on Lofton's body. He said either the gun was farther away, or there was more clothing he was unaware of. A defense firearms examiner said the Crown Royal bag from Macomber's car had damage consistent with a gun discharging from inside it.

The jury found Macomber guilty of involuntary manslaughter. The district court sentenced him to 136 months' imprisonment. On appeal, Macomber initially challenged his conviction on three grounds: (1) the district court should have granted his pretrial motion to dismiss based on statutory self-defense immunity; (2) the district court should not have instructed the jury on involuntary manslaughter because he claims there was insufficient evidence to convict him; and (3) the district court incorrectly instructed the jury on self-defense. A Court of Appeals panel affirmed. *State v. Macomber*, No. 113,869, 2017 WL 2713209, at *14 (Kan. App. 2017) (unpublished opinion) (*Macomber II*).

Macomber petitioned for review on two issues: (1) whether the panel erred by concluding the district court appropriately denied his pretrial motion to dismiss on self-defense immunity grounds; and (2) whether the panel erred in determining any error in the self-defense instructions was harmless. We granted review. Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

8

Macomber argues the district court should have dismissed the case based on self-defense immunity under K.S.A. 2018 Supp. 21-5231. The court held the State showed probable cause that deadly force was not justified. We discern no error.

*Additional background*

Macomber argued immunity was warranted based on these factual assertions keyed to the record from his first trial:

- his statements that Lofton threatened to shoot him, was reaching into the car, was possibly trying to unlock the door, was grabbing at the gun, and at one point got ahold of the Crown Royal bag;
- Saville's statement to Agent Steve Bundy that Macomber told her Lofton was going to get a gun;
- the witnesses' agreement that Lofton went to the driver's door; and
- Kenoly's testimony that the exchange became heated and Lofton reached into the car and had a "tussle" with Macomber.

The State argued three alternative points: (1) Macomber waived immunity by failing to assert it before the first trial; (2) if Macomber did not waive immunity, there should be a hearing for the State to demonstrate probable cause; and (3) probable cause existed to believe Macomber should not be immune from prosecution. To support its probable cause claim, the State cited evidence from the first trial, including:

- Macomber's testimony that he knew Lofton was unarmed;

9

- Macomber's testimony that he cocked the gun when Lofton went to the driver side;

- Macomber's testimony that he considered firing a round, but then the gun went off;

- Risa's testimony that Macomber pointed the gun at Ryan as he walked around the car;

- Kenoly's testimony that he heard Lofton ask "what are you going to do, shoot me?"

- Risa's testimony that Macomber's window was not down far enough for Lofton to reach through;

- Testimony from Risa and Kenoly that Lofton did not threaten Macomber;

- Taylor's testimony that Lofton was running from the car when he was shot; and

- There was no stippling from the gunshot on Lofton's body or clothing.

The district court denied the immunity request, ruling:

"The long and short of it is at this point in time I find that the use of force was not necessary under the factual circumstances that were before the Court. It's beyond what a reasonable person under the circumstances would have believed was necessary. I also found that the defendant's statement during the point in time of the trial that he testified that Ryan Lofton had threatened to shoot him was not a credible statement. That doesn't mean it doesn't come in for the jury to weigh at that point in time. I weighed it for a specific purpose, and that was the purpose on the motion to dismiss based on immunity at this point in time. The defendant's version that Ryan Lofton was reaching into the car when the gun went off is not supported by the scientific evidence or the factual evidence in this case. There is quite simply a break in time between when Mr. Lofton was reaching in the car to when the victim, Mr. Lofton, was shot in this case. There is no evidence that Mr. Lofton had a gun. In fact, the defendant admits that, and he was pretty sure he didn't

10

have a gun at one point in time and later he testified that he did not have a gun, referring to Mr. Lofton.

"Anyway, what I find is that the State has met its burden in this particular case and that was that they had to establish that the force was not justified as part of the probable cause determination. And I find that they have met that burden and I'm dismissing—or denying, I should say, the defendant's motion to dismiss based on immunity grounds in this case."

Before the panel, Macomber advanced a two-pronged challenge. First, he disagreed that the evidence did not support his theory that Lofton was reaching into the vehicle when the gun went off, and that there was a "break in time" between when Lofton reached into the car and the gunshot. He contended there was no conflicting evidence to consider because the evidence only showed Lofton reaching into the vehicle and saying "'What are you going to do—shoot me?" was simultaneous with the gunshot. Second, he argued the court abused its discretion based on an error of law when it ruled his testimony about Lofton threatening to shoot him was not credible. He claimed his statements were consistent with each other and the other witnesses' and that he made them before having a motive to lie.

The panel held the district court's factual findings were supported by substantial competent evidence. *Macomber II*, 2017 WL 2713209, at *14. And based on that, it concluded the district court did not err when it ruled the State met its probable cause burden because "[t]here was sufficient evidence to find that Macomber did not reasonably believe use of deadly force was necessary." 2017 WL 2713209, at *14.

*Standard of review*

"(a) A person who uses force which, subject to the provisions of K.S.A. 21-5226, and amendments thereto, is justified pursuant to K.S.A. 21-5222, 21-5223 or 21-5225,

11

and amendments thereto, is immune from criminal prosecution and civil action for the use of such force, unless the person against whom force was used is a law enforcement officer who was acting in the performance of such officer's official duties and the officer identified the officer's self in accordance with any applicable law or the person using force knew or reasonably should have known that the person was a law enforcement officer. As used in this subsection, 'criminal prosecution' includes arrest, detention in custody and charging or prosecution of the defendant.

. . . .

"(c) A prosecutor may commence a criminal prosecution upon a determination of probable cause." K.S.A. 2018 Supp. 21-5231.

An appellate court applies a bifurcated standard of review to the probable cause determination. Factual findings arising from disputed evidence are reviewed for substantial competent evidence. The ultimate legal conclusion drawn from those facts is reviewed de novo. *State v. Hardy*, 305 Kan. 1001, 1012, 390 P.3d 30 (2017).

*Discussion*

Before this court, Macomber does not challenge the district court's legal conclusion. Instead, he disagrees with the court's factual findings that: (1) his version was not compatible with the eyewitness and scientific testimony; and (2) there was a "break in time" between when Lofton reached into the car and the gunshot. The argument boils down to whether the court should have found his statements more persuasive than the other evidence.

In reviewing a trial court's factual findings for substantial competent evidence, "[a]n appellate court does not 'reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence.'" *State v. Sharp*, 289 Kan. 72, 80, 210 P.3d 590 (2009);

12

see also *State v. Evans*, 305 Kan. 1072, 1073-75, 389 P.3d 1278 (2017) (district court ruling on defendant's immunity claim found victim's testimony was not credible; findings supported by substantial competent evidence). "Substantial competent evidence is that which possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can reasonably be resolved." *Sharp*, 289 Kan. at 88.

The probable cause determination contemplated by the immunity statute requires a district court to "consider the totality of the circumstances, weigh the evidence before it without deference to the State, and determine whether the State has carried its burden to establish probable cause that the defendant's use of force was not statutorily justified." *Hardy*, 305 Kan. at 1012. To be statutorily justified, conduct must meet a two-part test:

> "'The first is subjective and requires a showing that [the defendant] sincerely and honestly believed it was necessary to kill to defend herself or others. The second prong is an objective standard and requires a showing that a reasonable person in [the defendant's] circumstances would have perceived the use of deadly force in self-defense as necessary.'" *State v. Haygood*, 308 Kan. 1387, 430 P.3d 11 (2018) (quoting *State v. McCullough*, 293 Kan. 970, 975, 270 P.3d 1142 [2012]).

In Macomber's case, conflicting evidence supports the trial court's findings that Lofton did not threaten to shoot him and that a time break occurred between Lofton reaching into the car and the shooting. As to the threat, Risa testified Macomber had the gun trained on Lofton before Lofton approached the driver's side window. And more pointedly, Risa and Kenoly said they did not hear Lofton make threats. Risa in particular said "no" when asked directly whether Lofton "threaten[ed] to hurt the defendant" or "threaten[ed] to shoot him."

As to the break in time, the panel held the district court's finding was supported by the evidence because "[t]he timing of when [Lofton's] arm was in the car was uncertain.

13

Reasonable minds could conclude either way." *Macomber II*, 2017 WL 2713209, at \*14. It also cited the deputy coroner's range-of-fire testimony; the testimony there was a short struggle between Macomber and Lofton, Risa, or both; and the testimony Lofton was either just standing next to the car or turning away from it when Macomber fired. And despite Macomber's insistence that the panel's analysis permitted the district court to "fill in the evidence gap" and relieved the State of its burden of proof, the evidence is sufficient to infer Lofton was no longer struggling with Macomber when he shot Lofton. For example, when asked where Lofton was when she heard the gunshot, Taylor said he "was turning around to—I'm guessing he seen the gun because he was turning around to run from the car." And the medical testimony supports an inference that Lofton was more than 36 inches from the gun—even though that inference conflicts with other evidence the gun was fired through the Crown Royal bag.

We hold there was probable cause that Macomber's use of deadly force was not statutorily justified. See *State v. Gayden*, 259 Kan. 69, 84, 910 P.2d 826 (1996) (district court affirmed based on facts, viewed in the light most favorable to the defendant, that could not support a reasonable belief deadly force was necessary).

In Macomber's case, the district court performed the gatekeeping function contemplated by K.S.A. 2018 Supp. 21-5231 by weighing the totality of evidence. See *Hardy*, 305 Kan. at 1011. And the version of events found by the district court is similar to those the *Gayden* court held did not support a reasonable-belief finding. The district court found support for its conclusion that there was probable cause to believe Macomber's deadly force was not justified within the disputed facts that: (1) Lofton did not threaten to shoot Macomber; (2) Lofton was not reaching into the car when the gun went off; (3) Lofton did not have a gun; and (4) Macomber was pretty sure Lofton did not have a gun.

14

We affirm the panel on this issue. The district court's factual findings were supported by substantial competent evidence, and the probable cause determination was correct based on those facts.

### FAILURE TO GIVE THE PRESUMPTION INSTRUCTION WAS HARMLESS

The panel never actually held whether the district court erred by not instructing on the self-defense presumption. That instruction provides that a person is presumed to have a reasonable belief that deadly force is necessary to prevent imminent death or great bodily harm if, at the time the force is used, the person against whom the force is used is unlawfully or forcefully entering, or has unlawfully or forcefully entered, and is present within, an occupied vehicle of the person using the force. *Macomber II*, 2017 WL 2713209, at *6-10; see K.S.A. 2018 Supp. 21-5224. Instead, the panel simply concluded it was a "close question" whether the instruction should have been given and then held any error was harmless. In doing so, it relied largely on *Pennington v. State*, No. 108,236, 2013 WL 5507291, at *3-4 (Kan. App. 2013) (unpublished opinion). *Macomber II*, 2017 WL 2713209, at *9-10.

On review, Macomber argues the district court's failure to instruct on the presumption of reasonableness violated his due process rights to a fair trial. In the alternative, he claims the error was not harmless under either the constitutional harmless-error standard, or the state-law harmless error standard. The State did not file a cross-petition or conditional cross-petition challenging the panel's decision to jump directly to harmless error. See Supreme Court Rule 8.03(c) (2019 Kan. S. Ct. R. 53). The State also did not claim the panel erred jumping to harmlessness in either a response to Macomber's petition for review or in a supplemental brief. See Supreme Court Rule 8.03(d) and Rule 8.03(i)(3).

15

Accordingly, we focus only on Macomber's due process and harmless error issues. We must first decide what harmless error standard to use.

*Standard of review*

"'[F]or instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in [*State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011)].' *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012)." *Haygood*, 308 Kan. at 1403.

*Discussion*

To place the issues into context within our jury instruction review framework, Macomber preserved the instruction challenge by requesting at trial the omitted instruction on presumption. See *Haygood*, 308 Kan. at 1404. And while our court has never addressed whether the jury must be instructed on the presumption, neither the lower courts nor either party suggests the requested instruction was not legally appropriate. *Cf. Hardy*, 305 Kan. at 1013 (district court must consider statutory presumption of reasonableness, when factually implicated, in determining motions for self-defense immunity).

*Any error arose out of state law*

The panel did not articulate what legal test it used in declaring any error harmless. But since Macomber requested the instruction, we determine harmlessness using the test and degree of certainty explained in *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011); see *State v. Ingham*, 308 Kan. 1466, 1476, 430 P.3d 931 (2018); *Haygood*, 308 Kan. at 1407. Under the *Ward* degree-of-certainty paradigm:

> "If the error infringes upon a right guaranteed by the United States Constitution, the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict. *Ward*, 292 Kan. 541, Syl. ¶ 6." *Ingham*, 308 Kan. at 1476.

If the error does not implicate a constitutional right, the error may be declared harmless when the benefitting party demonstrates there is "no reasonable probability that the error affected the outcome of the trial in light of the entire record." *State v. Moyer*, 306 Kan. 342, 359, 410 P.3d 71 (2017).

In Kansas,

> "(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.
>
> "(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly

17

force is necessary to prevent imminent death or great bodily harm to such person or a third person.

"(c) Nothing in this section shall require a person to retreat if such person is using force to protect such person or a third person." K.S.A. 2018 Supp. 21-5222.

And

"(a) For the purposes of K.S.A. 21-3211 and 21-3212, prior to their repeal, or K.S.A. 21-5222 and 21-5223, and amendments thereto, a person is presumed to have a reasonable belief that deadly force is necessary to prevent imminent death or great bodily harm to such person or another person if:

(1) The person against whom the force is used, at the time the force is used:

(A) *Is unlawfully or forcefully entering, or has unlawfully or forcefully entered, and is present within, the dwelling, place of work or occupied vehicle of the person using force*; or

(B) has removed or is attempting to remove another person against such other person's will from the dwelling, place of work or occupied vehicle of the person using force; and

(2) the person using force knows or has reason to believe that any of the conditions set forth in paragraph (1) is occurring or has occurred.

"(b) The presumption set forth in subsection (a) does not apply if, at the time the force is used:

18

(1) The person against whom the force is used has a right to be in, or is a lawful resident of, the dwelling, place of work or occupied vehicle of the person using force, and is not subject to any order listed in K.S.A. 21-3843, prior to its repeal, or K.S.A. 21-5924, and amendments thereto, that would prohibit such person's presence in the property;

(2) the person sought to be removed is a child, grandchild or is otherwise in the lawful custody or under the lawful guardianship of the person against whom the force is used;

(3) the person using force is engaged in the commission of a crime, attempting to escape from a location where a crime has been committed, or is using the dwelling, place of work or occupied vehicle to further the commission of a crime; or

(4) the person against whom the force is used is a law enforcement officer who has entered or is attempting to enter a dwelling, place of work or occupied vehicle in the lawful performance of such officer's lawful duties, and the person using force knows or reasonably should know that the person who has entered or is attempting to enter is a law enforcement officer." (Emphasis added.) K.S.A. 2018 Supp. 21-5224.

Macomber argues omitting the presumption instruction triggers constitutional harmless error, suggesting his due process rights were violated because the omission deprived him of a meaningful opportunity to present a complete defense. An appellate court reviews de novo a claim that the trial judge interfered with the defendant's constitutional right to present a defense. *State v. Carter*, 284 Kan. 312, 318-19, 160 P.3d 457 (2007).

The State does not directly address harmlessness as to this issue, but touches on the nature of the claimed error when addressing cumulative jury instruction error. There,

19

the State argues the instructions could not have implicated Macomber's right to present a defense because that right only encompasses the right to present evidence. And it notes Macomber was not prevented from presenting any evidence supporting his self-defense claim.

We need not dive too deeply into this because even if a failure to give jury instructions on a theory of defense does not fall under the right to present a defense, it must be acknowledged instruction errors can implicate defendants' due process rights to a fair trial depending on the circumstances. See 6 LaFave, Israel, King & Kerr, Criminal Procedure § 24.8(g) (4th ed. 2018) ("Some courts find that when [an affirmative defense instruction is requested and factually appropriate] . . . the failure to give an instruction violates the defendant's due process right to present a defense or to a fair trial. Others apply a more general due process test requiring proof of prejudice, or apply harmless error review."). And the authority *Macomber* cites for his constitutional error claim, *Barker v. Yukins*, 199 F.3d 867 (6th Cir. 1999), illustrates a circumstance when jury instructions made the State's path to conviction easier by adding an element of proof to defendant's affirmative defense.

But that is the point. *Barker* is distinguishable. Failing to instruct on the presumption in Macomber's case did not add another element to Macomber's burden, or somehow lessen the State's burden.

"[A] rebuttable statutory presumption constitutes a rule of evidence . . . ." *State v. Johnson*, 233 Kan. 981, 986, 666 P.2d 706 (1983). When the presumption favors the State, "the jury must be clearly instructed as to the nature and extent of the presumption and that it does not shift the burden of proof to the defendant." 233 Kan. at 986. A presumption that proof of one fact is prima facie evidence of another "*governs only the*

*burden of going forward with evidence, not the ultimate burden of proof.*" (Emphasis added.) *State v. Smith*, 223 Kan. 192, 193, 573 P.2d 985 (1977).

Because the omission would not have affected the burden of proof, i.e., the State's duty to disprove the affirmative defense, we hold any error in failing to give the instruction at issue would be classified as a state-law error.

*There is no reasonable probability any error affected the outcome*

In declaring the omission harmless, the panel quoted from *Pennington*, 2013 WL 5507291, at *3-4, in stating:

"'Under the [statutory language setting out the presumption], jurors must presume deadly force was appropriate in the stated factual circumstances until they are persuaded otherwise beyond a reasonable doubt by the evidence admitted at trial. That determination reflects a subset of the decision-making jurors would go through in evaluating the law of self-defense and reasonable doubt in any event. That is, jurors must presume a defendant to be not guilty and may not conclude otherwise unless they are persuaded beyond a reasonable doubt. The same holds true in a self-defense case. The State has the obligation to prove the elements of the crime beyond a reasonable doubt notwithstanding the evidence of self-defense. Jurors, therefore, may not find a defendant guilty unless they are persuaded beyond a reasonable doubt he or she did not act in self-defense. To do so, they must be persuaded beyond a reasonable doubt—overcoming the presumption of innocence—that the defendant did not hold an objectively reasonable belief that force was necessary to defend himself or herself or a third person. That conclusion is the same one described in the new presumption language in PIK Crim. 4th 52.210.'" *Macomber II*, 2017 WL 2713209, at *9.

The panel concluded the instructions given in Macomber's case required the jury to find beyond a reasonable doubt that "it did not appear to Macomber or Macomber did not reasonably believe deadly force was necessary . . . to prevent death or great bodily

21

harm to himself from Ryan's imminent use of unlawful force." 2017 WL 2713209, at *9-10.

The panel's rationale appears to follow this progression: (1) the State must prove the defendant is guilty beyond a reasonable doubt; (2) to do so, it must demonstrate beyond a reasonable doubt the defendant did not act in self-defense; (3) to do that, the State must demonstrate the defendant did not reasonably believe deadly force was necessary to prevent imminent death or great bodily harm; (4) the presumption is rebutted if the State proves beyond a reasonable doubt the defendant did not reasonably believe deadly force was necessary to prevent imminent death or great bodily harm; and (5) the instructions required the jury to find Macomber did not reasonably believe deadly force was necessary to prevent imminent death or great bodily harm—therefore (6) the jury would certainly have concluded the State rebutted the presumption if the instruction was given. In essence, by following the panel's logic, a failure to instruct on the self-defense presumption can never be prejudicial. We disagree.

Admittedly, the panel's propositions (1), (2), (3), and (5) are accurate. Self-defense is an affirmative defense, but once a defendant properly asserts it "'the State must disprove that defense beyond a reasonable doubt.'" *Haygood*, 308 Kan. at 1406. This means the State must disprove that the defendant "reasonably believes that [such] use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person." K.S.A. 2018 Supp. 21-5222(b). And when a jury is instructed on defense of a person, reasonable doubt, the burden of proof, and the fact that the State's burden of proof never shifts to defendant, those instructions as a whole encompass "everything necessary for the jury to consider the burden of proof . . . ." *State v. Staten*, 304 Kan. 957, 966, 377 P.3d 427 (2016).

22

The panel's proposition (4)—the presumption is rebuttable—is supportable under the caselaw and arguably remains an open question. See *Pennington*, 2013 WL 5507291, at *3 (after holding presumption not triggered on facts of defendant's case, concluded the presumption is rebuttable in dicta). This court has said when addressing more common presumptions *against* the accused that, "[u]nder the criminal law, a presumption is only a permissive inference, leaving the trier of fact free to consider or reject it." *State v. Clemons*, 251 Kan. 473, 487, 836 P.2d 1147 (1992), *abrogated on other grounds by State v. James*, 276 Kan. 737, 79 P.3d 169 (2003). But we also note the Legislature has demonstrated an intent to create presumptions that are conclusive in other areas by specifically labeling them as conclusive. See K.S.A. 2018 Supp. 17-7207(a)-(c) (providing situations in which notice of certain facts related to ownership or transfer of stock in close corporations is conclusively presumed); K.S.A. 2018 Supp. 44-501(b)(1)(C) (providing it "shall be conclusively presumed" workers compensation claimant was impaired by alcohol or drugs if evidence shows specified concentrations of alcohol or drugs in claimant's system); but *cf.* K.S.A. 2018 Supp. 23-2208(b) (providing presumption of paternity may be rebutted only by clear and convincing evidence).

Regardless, the panel's certainty about its proposition (6) seems overstated because an instruction on the presumption may render a jury more susceptible to acquitting in some circumstances.

"*The purpose of a presumption operating against the accused in a criminal case, i.e., an instructed inference, is to guide the jury by highlighting the propriety of drawing a factual inference they might otherwise be naturally less likely to draw*. Reluctance on the part of the jury to draw the inference may arise simply because the jury is unaware that once having found particular facts to exist they may infer an element of the offense such as intent or knowledge. *In other cases the reluctance to infer arises because the jury may be unaware absent an instruction that a particular fact naturally flows from certain other facts they have found to exist*. The latter may occur, for example, with respect to the

23

presumption that illegal importation may be inferred solely from possession of certain specified narcotic drugs by the defendant in this country. Encouragement of the trier of fact to draw the factual inference, by virtue of it being the subject of an instructed inference, is designed to assist the prosecution." (Emphases added.) 2 Handbook of Fed. Evid. § 303:4 (8th ed. 2018).

Applying this reasoning to K.S.A. 2018 Supp. 21-5222's presumption operating *for* the accused, some utility is apparent in a case like Macomber's. In other words, an instruction on circumstances in which using deadly force is presumed reasonable informs the jury that a reasonable belief that deadly force is necessary to prevent death or great bodily harm naturally flows from the fact, if found, that the assailant was attempting to enter the defendant's occupied vehicle. Such an instruction may encourage the jury to draw the factual inference of reasonableness—or to *not* draw the factual inference of *un*reasonableness—and make the jury less inclined to find the State met its burden of proof than it otherwise would without the instruction. Said differently, a presumption instruction can tilt the balance even further in the defendant's favor than just the presumption of innocence.

Two Texas decisions involving the same defendant, illustrate this: a Texas Court of Appeals decision reversing a conviction because the trial court failed to instruct on a self-defense presumption of reasonableness; and the subsequent Texas Court of Criminal Appeals decision reversing it. See *Villarreal v. State*, 453 S.W.3d 429 (Tex. Crim. 2015); *Villarreal v. State*, 393 S.W.3d 867 (Tex. App. 2012).

Both appeals considered the circumstances when a jury convicted Villarreal of murdering a fellow partygoer after a verbal altercation. Several witnesses testified the victim was unarmed, but Villarreal told police the stabbing happened after the victim came at him with a sharp object. Under Texas law, use of deadly force is presumed reasonable if the defendant knew or had reason to believe the victim was committing or

24

attempting to commit murder; the defendant did not provoke the victim; and the defendant was not otherwise engaged in criminal conduct. Texas law required the jury to be instructed on favorable presumptions supported by the evidence, but the instruction was not given and the jury rejected a self-defense claim.

The harmlessness test the Texas courts applied was whether the omission was "so egregious and created such harm that the defendant was deprived of a fair and impartial trial." 453 S.W.3d at 433. The Texas Court of Appeals held this standard was met. It reasoned the instruction's absence significantly undermined the self-defense claim when the primary issue was whether Villarreal's deadly conduct was justified, there was conflicting testimony about that, and closing arguments highlighted the disputed reasonableness of Villarreal's conduct. The court concluded failing to instruct on the presumption under those circumstances deprived Villarreal of its benefit. See *Villarreal*, 393 S.W.3d at 875-76.

On review, the Texas Court of Criminal Appeals took a contrary view and reversed. The court agreed the instructions weighed in favor of finding harm because they did not include the required presumption. But it disagreed on the weight to give the instruction's absence because the jury still would be able to conclude the presumption was inapplicable based on the facts. *Villarreal*, 453 S.W.3d at 433. In this instance, the evidence showed the victim was unarmed and Villarreal either assaulted the victim or provoked the physical violence. See 453 S.W.3d at 443.

In Macomber's case, the witness testimony is at best ambiguous about what happened. Among these varying accounts, one factual interpretation has Lofton agitated, yelling at Macomber, pulling on the car door and window, and reaching into the car to grab at the gun when Macomber fired. In *Villarreal*, the factual version favoring the presumption was based on minimal evidence that was clearly contradicted by the

25

remaining evidence. In Macomber's case, the version favoring a presumption is also slight, but just as plausible as any other version of the facts presented. This means the evidence is inconclusive whether Macomber acted in self-defense.

But that balance gets tipped in favor of harmlessness by Macomber's own statements. They strongly suggest he did not actually believe deadly force was necessary to prevent death or great bodily harm, even if Lofton was entering or within the car as the statute contemplates. In his call with Malick, Macomber said Lofton "kept talking shit like I was afraid of him so I shot him." And in a later interview, Macomber said he planned to fire a round off to get Lofton off the car. In yet another jailhouse call, he said he fired off a round to let Lofton know he had a gun.

Given this, there is no reasonable probability a properly instructed jury would reject the State's claim that Macomber did not reasonably believe deadly force was necessary. Macomber's own statements—direct evidence of his state of mind—strongly undercut any claim he subjectively believed deadly force was necessary to prevent harm to himself. See *State v. Walters*, 284 Kan. 1, 9, 159 P.3d 174 (2007) (first inquiry in self-defense analysis examines defendant's subjective belief and requires evidence indicating defendant honestly and sincerely believed it would be necessary to kill in self-defense).

Judgment of the Court of Appeals affirming the district court is affirmed on the issues subject to review. Judgment of the district court is affirmed.

STEGALL, J., not participating.

26

MICHAEL J. MALONE, Senior Judge, assigned. [1]

* * *

JOHNSON, J., concurring in part and dissenting in part: I agree with the majority's opinion up to the point that it cherry-picks only those statements by Stephen A. Macomber that support its conclusion that "he did not actually believe deadly force was necessary to prevent death or great bodily harm, even if Lofton was entering or within the car as the statute contemplates." Slip op. at 26. In doing so, the majority apparently assigns no weight or credibility to Macomber's *other* recited statements. For instance, Hedy Saville testified that Macomber said the man was going to shoot him; KBI Agent Steve Bundy testified that Macomber told him that he assumed Ryan Lofton had a gun, that Lofton threatened to shoot him and had a house full of people, and that there had been five recent neighborhood shootings; and in Macomber's recorded jailhouse telephone call to Theresa, he said Lofton threatened to shoot him and there were four to five people inside and outside the house when Lofton began pulling on the car door and trying to grab the handgun. Slip op. at 4-6. Those statements do not definitively refute the presumption of self-defense.

When the majority relies on selected portions of the evidence, while ignoring other contradictory evidence, it is engaging in evidence-weighing and credibility-assessment. That tack runs counter to our oft-repeated prohibition against acting as the fact-finder when engaging in appellate review. In my view, the conflicting testimony could not, as a

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 113,869 vice Justice Stegall under the authority vested in the Supreme Court by K.S.A. 20-2616.

27

matter of law, definitively rebut the statutory presumption that self-defense was necessary. Given that this is not a circumstance in which the evidence is viewed in the light most favorable to the State, I would hold that the State did not meet its burden to show that withholding an instruction on the presumption was harmless, i.e., that there was no reasonable probability that a properly instructed jury would apply the legal presumption of self-defense. See *Siruta v. Siruta*, 301 Kan. 757, 772, 348 P.3d 549 (2015) (explaining that for preserved jury instruction errors, the party benefiting from error has the burden to show harmlessness).

NUSS, C.J., and LUCKERT, J., join in the foregoing concurring and dissenting opinion.